District Court
District of Connecticut
FILED AT NEW HAVEN

February 16        20 24

By      S. Santos
        Deputy Clerk

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A 2022 CHEVROLET MALIBU, CALIFORNIA REGISTRATION 8YLB972 AND TWO IPHONES ONE OF WHICH IS ASSIGNED TELEPHONE NUMBER (203) 361-8137 | : : : : : : : : : : : | Case No. 24-mj-00114 (MEG) |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Anthony Fasulo, being duly sworn, depose and state as follows:

**I.    INTRODUCTION AND AGENT BACKGROUND**

1.    I, Anthony Fasulo, am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I am currently assigned to the New Haven District Office Task Force.

2.    I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am currently employed by the Connecticut State Police, and have been since June 2015.  I have been assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer (TFO) since May 2021. During my tenure as a police officer and Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking. I am currently assigned to the New Haven District Office, Organized Crime Drug Enforcement Task Force, ("Task Force") which is composed of personnel from the DEA, United State Marshal Service ("USMS"), New Haven Police Department ("NHPD"), West

1

Haven Police Department ("WHPD"), Branford Police Department, ("BPD"), Meriden Police

Department ("MPD"), Ansonia Police Department ("APD"), Middletown Police Department

("MPD"), Naugatuck Police Department ("NPD"), and Waterbury Police Department ("WPD").

3.      I have received instruction relative to conducting drug investigations while

attending the Connecticut Police Academy (POSTC) in Meriden, Connecticut, as well as other

training classes relative to narcotics trafficking. Over the past seven (7) years in law

enforcement, I have participated in the execution of numerous seizure warrants which have

resulted in the seizure of narcotics, United States currency, assets acquired with drug proceeds

and assets utilized to facilitate drug activities. I have participated in numerous investigations

involving individuals suspected of distributing illegal drugs, participated in controlled purchases

of illegal drugs utilizing cooperating witnesses, confidential sources and undercover

agents/officers, and obtained and coordinated the execution of search and arrest warrants

pertaining to individuals involved in the distribution of illegal drugs. Moreover, I have conducted

physical surveillance of individuals involved in illegal drug distribution, analyzed records

documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as

well as other local, state and federal law enforcement officers, regarding the manner in which

drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

In the course of my duties, I have assisted state prosecutors prepare affidavits in support of

applications for search warrants and arrest warrants, and have executed numerous search and

arrest warrants. I have supervised the activities of cooperating witnesses who have provided

information and assistance in state prosecution of drug offenders. As a result of my training and

experience, I am familiar with the manners in which controlled substances are commonly

brought to Connecticut, manufactured, processed, packaged and distributed. I know the relative

wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and organizations that illegally transport and distribute controlled substances, as well as the devices commonly utilized by them.

4.      I have participated in numerous investigations involving individuals suspected of distributing illegal drugs, coordinated controlled purchases of illegal drugs utilizing cooperating witnesses, confidential sources and undercover agents/officers, and obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs. Moreover, I have conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, provided testimony in jury proceedings, and spoken with informants and subjects, as well as other local, State and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. In addition, I receive periodic in-service training relative to conducting drug investigations. In the course of my duties, I have assisted state and federal prosecutors prepare affidavits in support of applications for federal/state search warrants and arrest warrants, and have executed numerous federal/state search and arrest warrants. I have supervised the activities of cooperating witnesses who have provided information and assistance in both state and federal prosecution of drug offenders. In my time with the DEA, I have participated in multiple Title-III investigations. As a result of my training and experience, I am familiar with the manner in which controlled substances are commonly imported, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. I am familiar with behaviors, methods and common practices of persons and

organizations that illegally import and distribute controlled substances, as well as the devices commonly utilized by them.

5.      As a result of my training and experience, I am familiar with the manner in which controlled substances are commonly imported, manufactured, processed, packaged and distributed. I know the relative wholesale and retail value of various types of controlled substances. For example, I know that heroin is commonly distributed at the street level in "bundles." A "bundle" consists of ten, single dosage unit bags of heroin that are bundled or tied together, with each bag containing between .02 and .03 grams of heroin. Single-dosage unit bags are often "stamped" with a brand name that is familiar to a particular distributor's customer base. A "brick" of heroin consists of five (5) "bundles" (i.e., 50 single dosage unit bags). The term "clip" is sometimes used to refer to ten "bundles" of heroin (i.e. 100 single dosage unit bags), and sometimes used to refer to five "bundles" of heroin. Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am familiar with many of the code words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics.

6.      During the course of my employment in law enforcement, I have participated in numerous narcotics trafficking and violent street gang investigations. In connection with these narcotics trafficking and violent street gang investigations, I have conducted physical and electronic surveillance, debriefed narcotics traffickers, gang members and informants, have been the affiant on affidavits in support of arrests warrants and search and seizure warrants, and have executed numerous arrests warrants and search and seizure warrants. I have also participated in

wiretap investigations and have been the affiant on affidavits in support of applications seeking authorization to intercept communications pursuant Title III, which have been approved by the district court.

7.      As a result of my training and experience, I am familiar with the behaviors, methods and common practices employed by drug traffickers and violent street gang members, including but not limited to those discussed below.

8.      I am familiar with the paraphernalia and devices commonly utilized by narcotics traffickers.

9.      I am familiar with and have analyzed records documenting the illegal purchase of and sale of controlled substances

10.     I am familiar with the practices commonly employed by narcotics traffickers and gang members to avoid detection by law enforcement

11.     As indicated above, during my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved drug trafficking violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their co-conspirators, residences of drug traffickers and their co-conspirators, premises and residences used by narcotics traffickers to process, "cook," and package narcotics for re-distribution, stash houses, used as storage locations for controlled substances, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

12.     Materials searched for and recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed

for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, paging devices, computers and computer disks; answering machines; and various valuable assets such as property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items, obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

13.     Based on my training and experience, I also know that powder drugs, such as heroin, leave microscopic residue on the surfaces of objects they have come in contact with, such as storage containers, which residue can be acquired, preserved and analyzed with equipment available to law enforcement.

14.     Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

    a.      drug traffickers often place assets in names other than their own to avoid
            detection of these assets by law enforcement;

    b.      drug traffickers often place assets in the names of businesses and corporate
            entities as nominee title holders in order to avoid detection of these assets by law
            enforcement;

    c.      even though these assets are placed in the names of other persons or entities, the
            drug traffickers actually own and continue to use these assets and exercise
            dominion and control over them;

d.   drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

e.   drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f.   drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of current and past drug associates within their residences;

h.   drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled

substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

i.    drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

j.    drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

k.    persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.    Drug traffickers and gang members often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers and gang members possession or residence;

m.    The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York and in this investigation Puerto Rico and California to purchase their narcotics for distribution. It is known that after purchasing these

narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments and government/contract mail carriers. The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

n.   based on my training and experience, drug traffickers and violent street gang members commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers, drugs, drug proceeds, and property;

o.   Based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug proceeds, drug inventory and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, or in the residences or cars of their trusted associates; based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often have, possess, maintain and control the items listed in Schedules A and B to this affidavit, in their homes, garages, out-buildings, and cars;

15.     I know that persons possess in their residence over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, check books, identification, notes, correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, leases, mortgage bills, vehicle registration information, ownership warranties, telephone answering machine introductions, and undeveloped film containing photographs (when developed) of themselves occupying the property.

16.     Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement. I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply. In addition, narcotic traffickers and drug dealers often use different telephones to deal with different "lines" of customers. For example, a

drug dealer may use one telephone to contact customers who regularly purchase small, pre-packaged quantities of narcotics and another telephone for customers who regularly purchase larger quantities, or may use different telephones to distribute different types of narcotics. Similarly, drug dealers whose business extends into multiple states, also sometimes use one telephone for local customers and another telephone for out-of-state customers. Further, I know that some drug dealers use a particular telephone for a period of time, and then cease use of it and begin use of another telephone, in an effort to avoid detection by law enforcement. Finally, notwithstanding the foregoing, I know that drug dealers often utilize two or more cellular telephones interchangeably for all their narcotics trafficking undertakings. This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more telephones interchangeably also enables distributors to immediately terminate service on one telephone without crippling their illegal business, if they believe the telephone is being targeted by law enforcement for installation of a court-authorized wiretap.

17.     I know based upon my training and experience that most cellular telephones have two basic components: 1) a handset, i.e. the telephone device itself; and 2) a chip, or SIM card (i.e. Subscriber Identity Module Card), which is inserted into the handset, and which can easily be removed and transferred to another handset. A handset is inoperable without a SIM card, except where it is used to place emergency 911 calls. I know, moreover, based upon my training and experience, and my investigation in this case, that cellular service providers maintain the following information, or identifiers, regarding each cellular telephone to which they provide service: (a.) MSISDN, or Mobile Station ISDN, which is the ten-digit telephone number; (b) IMEI/ESN, or International Mobile Equipment Identity/Electronic Serial Number, which is the unique serial number assigned to the handset device itself and/or MEID/Device ID, or Mobile

Equipment Identifier, which is a form of ESN; and (c) IMSI, or International Mobile Subscriber

Identity, which is a unique 15-digit code associated with the mobile subscriber and which is

stored on the SIM card that is inserted into the handset. When a SIM card is inserted into a

handset, and the handset is turned on, the SIM card transmits the telephone number, IMSI and

IMEI associated with the cellular telephone to the Companies' networks, thus registering it with

the networks so that communications to and from the cellular telephones can be facilitated.

18.     I make this affidavit in support of a search warrant for a 2022 Chevrolet Malibu

bearing California Registration 8YLB972, (the "**Subject Vehicle**"), which was seized on

February 6, 2024 and used to facilitate narcotic transactions, and two iPhones; one of which is

assigned (203) 361-8137, (**Target Telephone 2**), that were both seized on February 6, 2024,

following the execution of a federal search warrant at 309 Poplar Street, New Haven,

Connecticut, and incident to the arrest of Robert WILLIAMS on an outstanding Connecticut

state arrest warrant.

19.     As part of my duties, I am currently participating in an investigation into

suspected ongoing narcotics trafficking, in violation of 21 U.S.C. §§ 841(a)(1) and 846 by

Robert WILLIAMS and other identified and unidentified individuals. Based on the facts set forth

in this affidavit, there is probable cause to believe, and I do believe, that violations of 21 U.S.C.

§§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics) and 846

(conspiracy to distribute and possess with intent to distribute narcotics) (hereafter referred to as

the "Target Offenses") have been committed, are being committed, and will be committed by

these individuals.

20.     I am familiar with the facts and circumstances of the aforementioned investigation

as a result of my personal participation in the investigation; from discussions with agents of the

DEA and other law enforcement personnel; from information provided by witnesses involved in the investigation; from my review or the reviews by others to whom I have spoken of pen register and telephone toll records; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable.

II.    **PROBABLE CAUSE**

21.    Since on or about December 2023, members of the DEA New Haven District Office along with members of the New Haven Police Department have been investigating a Drug Trafficking Organization (DTO) of which Daniella FOX (currently charged in this district in case no. 22-cr-43) was a member.  Multiple controlled purchases have been conducted into cellular telephone numbers that the DTO is utilizing, to include TARGET TELEPHONE 1 (203) 410-0081 and TARGET TELEPHONE 2 (203) 361-8137, by a confidential source (CS).

A.    **FIRST CONTROLLED PURCHASE**

22.    During the week ending February 2, 2024 members of the DEA New Haven District Office formulated plans to conduct a controlled purchase from TARGET TELEPHONE 2.  DEA NHDO members planned to utilize a DEA Confidential Source (CS) to conduct the controlled purchase.  TFO Kyle Savo and I met with the DEA CS at a pre-determined clandestine location prior to the controlled purchase.  The CS was directed to place a call to

TARGET TELEPHONE 2 where the telephone rang and went to voicemail. The CS then received a call from TARGET TELEPHONE 2 and spoke with an unknown male where he/she was directed to meet a female that would conduct a narcotic transaction at 309 Poplar Street, New Haven. Prior to the CS going to the residence, the CS spoke to the unknown male on TARGET TELEPHONE 2 and then the male directed the CS to knock on the front door and a female would let the CS in. The CS then traveled in the direction of 309 Poplar Street, and upon arrival, knocked on the front door. The CS was let into the common front door entry way and stated that he/she went into the first apartment on the right-hand side. While inside the CS stated that he/she met with an unknown light skinned Hispanic female and conducted the narcotic transaction. The CS stated that he/she then left the apartment and exited the residence. The CS was then met a pre-determined clandestine location where the CS relinquished four (4) white wax folds of suspected fentanyl stamped "Bugatti" and two (2) blue zip lock style baggies containing a white rock like substance suspected to be crack cocaine. Through law enforcement databases, investigators were able to identify the residence as 309 Poplar Street, Apt B, New Haven, CT. Further law enforcement in-house data showed that a female with the name Destiny VARGAS may reside at the residence. Investigators were able to obtain a DMV photograph of VARGAS, which was shown to the CS. The CS confirmed that the female who conducted the narcotic transaction was the same female that the CS was shown a picture of.

**B.**   **SURVEILLANCE AND ARREST OPERATION**

23.      On January 30, 2024 at approximately 4:00 P.M., members of the DEA New Haven District Office conducted surveillance of 309 Poplar Street, Apt B, New Haven, CT. While conducting surveillance investigators were able to observe a female wearing a white coat, green pants, and white high-top sneakers approach the rear outside window of Apartment B.

Investigators observed the window open and a female appear from the inside of the apartment. The female inside and the female outside were observed to have a brief interaction and the female outside walked away from the open window. Investigators then observed the female inside of the apartment poke her head through the open window. A photograph was obtained of the female and investigators were able to observe that the female appeared to be VARGAS.

24. Shortly after the female outside of the residence departed the area, investigators surveilled her and maintained constant surveillance. Investigators were able to surveil the female to the rear of a church on Poplar Street, where uniformed members of New Haven Police Department approached her. While investigating, Officers were able to locate two (2) wax folds suspected to be fentanyl and one (1) zip lock style bag containing a white substance suspected to be cocaine. The female was arrested by New Haven Police Department for criminal trespassing and possession of narcotics. During a field interview conducted by Officers, the female explained that she bought narcotics from the female inside of the apartment at the window. She also stated that she knows of multiple unknown males distributing narcotics from within the apartment.

### C.      CONTROLLED PURCHASE AND IDENTIFICATION OF WILLIAMS

25. During the week ending February 2, 2024, members of the DEA New Haven District Office formulated plans to conduct a controlled purchase from TARGET TELEPHONE 2. DEA NHDO members planned to utilize a DEA Confidential Source (CS) to conduct the controlled purchase. TFO Kyle Savo and I met with the DEA CS at a pre-determined clandestine location prior to the controlled purchase. Prior to conducting this controlled purchase investigators established surveillance at the Subject Premises. Investigators observed a white Chevrolet Malibu bearing California Registration 8YLB972 (**Subject Vehicle**) pull into

the rear parking lot of 309 Poplar Street.  Investigators observed it to be occupied by an unknown black male wearing a grey sweat suit with a black baseball style hat.  Investigators utilized a high-definition digital camera and took numerous photographs of the male.  Investigators observed the male retrieve a bag of dog food from the vehicle and walk to the left rear door of the house.  Investigators observed the male knock on the left rear window of the first floor where investigators observed Destiny VARGAS selling narcotics from on January 30, 2024.

26.     TFO Savo and I then met with the CS at a clandestine pre-determined meet location.  The CS was searched prior to the purchase, yielding negative results.  The CS was then instructed to place a phone call to TARGET TELEPHONE 2.  While on speaker phone and in the presence of TFO Savo and I, the CS and the unknown male agreed to meet in the area of Key Food Grocery.  The CS then traveled to the area and again spoke with the unknown male on TARGET TELEPHONE 2.  The male stated that he would be there in about two minutes.  After a short period of time investigators observed the unknown black male in the grey sweat suit exit the rear door of 309 Poplar Street and enter the white Chevrolet Malibu (the **Subject Vehicle**).  Moments later the vehicle departed the residence.  Surveillance units followed the Subject Vehicle to the area of the grocery store parking lot where he met with the CS.  The CS was observed entering the front right passenger seat of the Subject Vehicle.  Moments later the CS was observed exiting the Subject Vehicle.  The unknown black male then departed the parking lot where surveillance units followed him out of the area.  The Subject Vehicle was followed to the area of Ferry Street where he was observed conducting another hand-to-hand transaction.  The CS then proceeded to a pre-determined clandestine location where the CS met with officers and relinquished four (4) white wax folds of suspected fentanyl and three (3) blue zip lock style baggies containing a white rock like substance suspected to be crack cocaine.

27.     A COLLECT/NCIC check of California Registration 8YLB972 (the **Subject Vehicle**) yielded the vehicle was registered to EAN Holdings which is an Enterprise Rental Vehicle.  TFO Savo called the Enterprise Law Enforcement line which yielded the vehicle was rented to Dayon NELSON.  TFO Savo then queried NELSON through a Law Enforcement database which yielded she was a protected party of a family violence protection order.  TFO Savo further queried NELSON through Law Enforcement databases which yielded a New Haven Police Department police report of NELSON being a victim of a domestic incident with Robert Marquise WILLIAMS.  TFO Savo retrieved a booking photo of Robert WILLIAMS where case agents were able to positively identify Robert WILLIAMS as the operator of the Subject Vehicle that exited 309 Poplar Street, New Haven and sold the narcotics to the DEA CS.  The CS was also provided a Connecticut Department of Motor Vehicle photograph of WILLIAMS where he/she identified WILLIAMS as the man who sold him/her narcotics.

**D.     EXECUTION OF WARRANT AT 309 POPLAR**

28.     On  February 6, 2024, at approximately 2:17 P.M. members of the DEA New Haven District Office executed a federal search and seizure warrant at 309 Poplar Street, Apt B. in New Haven, Connecticut.  The warrant was authorized by Magistrate Judge Robert M. Spector  on February 5, 2024 (24-mj-104).

29.     Prior to executing the search and seizure warrant investigators established surveillance in the area of 58 Webb Street, Hamden, a residence that investigators were made aware of earlier in the day, by law enforcement partners.  At approximately 10:56 A.M. investigators observed Robert WILLIAMS, wearing jeans, a black jacket, with a black winter cap exit the residence of 58 Webb Street and enter the driver seat of the white Chevrolet Malibu bearing California Registration 8YLB972 (**Subject Vehicle**).  Investigators were able to surveil

WILLIAMS into the area of St Raphael's Hospital, where at one point they observed him pull to the side of the road and appear to discard an item into the sewer drain. Investigators stopped at that location after WILLIAMS left the area but were not able to locate anything of evidentiary value.

30.     WILLIAMS then traveled in the direction of the St. Raphael's where he was observed to circle the block. This maneuver is known by law enforcement through their training and experience as counter surveillance. Often times narcotic dealers use this method to identify any vehicles that have been following them. WILLIAMS was then observed to pull into the entrance of St. Raphael's hospital. It was later discovered that WILLIAMS was attempting to enter the hospital but refused to check in with security. Security relayed to investigators that WILLIAMS was irate due to the fact that they would not let him in without checking in and/or providing his identity.

31.     WILLIAMS then was able to evade detection by leaving the area on foot and not returning to the Subject Vehicle, which was later discovered during an interview of VARGAS. In the early afternoon, investigators were able to establish that WILLIAMS's probable location was 309 Poplar Street because the telephone he was believed to be carrying – TARGET TELEPHONE 2 – was the subject of a court-ordered telephonic ping warrant (location warrant) authorized by Magistrate Judge Spector on January 24, 2024 (24-mj-74).

32.     At approximately 2:17 P.M. members of the DEA New Haven District Office executed the search warrant at 309 Poplar Street. During the execution, investigators encountered Robert WILLIAMS and Destiny VARGAS. They were both detained without incident. Prior to searching the residence both VARGAS and WILLIAMS were separated.

18

33.     An on-scene interview was conducted by TFO Fasulo and TFO Eannotti with VARGAS.  VARGAS stated that WILLIAMS has been her paramour for approximately three months, and she knows him to sell a large amount of narcotics.  VARGAS was asked if there were any narcotics inside of the residence.  VARGAS was cooperative and stated that she was forced to hide the narcotics that WILLIAMS brought in her pants on her body.  VARGAS stated that when WILLIAMS heard law enforcement knock and announce their presence, WILLIAMS stuffed the narcotics in her pants.  VARGAS stated that she is afraid of WILLIAMS because he has threatened her in the past and that he forces her to sell narcotics on his behalf.  VARGAS further stated that she has on multiple occasions tried to block WILLIAMS's cell phone number but somehow he locates her and forces her to again sell narcotics.  VARGAS stated that she knows that WILLIAMS stays with the mother of his child in Hamden at 58 Webb Street and stores narcotics at this residence and in the Subject Vehicle.

34.     VARGAS stated that prior to WILLIAMS arriving at the residence he called her from TARGET TELEPHONE 2 and stated that he was being followed.  VARGAS asked how he knew that and WILLIAMS explained that while on Webb Street, he was notified by Stasci FLOWERS, who resides at 58 Webb Street that multiple unknown vehicles were observed on the home's security camera following WILLIAMS as he departed the area.  VARGAS was asked what quantity of narcotics she has seen WILLIAMS in possession of and she stated that she knows him to have thirty bricks of fentanyl with him or in the 58 Webb Street, Hamden.  Through my training and experience I know that thirty bricks of fentanyl to be approximately 1,500 individual bags.  The interview of VARGAS ended and she was released without incident.

35.     Following the execution of the federal search warrant at 309 Poplar Street, WILLIAMS was arrested on an unrelated, outstanding Connecticut state arrest warrant.

19

Investigators located two iPhones that were in the possession of WILLIAMS. Investigators called Target Telephone 2 from a blocked number where one of the iPhones found in WILLIAMS's possession began to ring. This telephone is a smaller gray iPhone with a cracked front screen. The other telephone is a larger green iPhone that is contained within a black phone case. Investigators also seized the Subject Vehicle from Saint Raphael's Hospital located at 1450 Chapel Street, New Haven where it was towed to the New Haven Police Department impound lot, located at 710 Sherman Avenue, New Haven.

### E. Execution of Warrant at 58 Webb Street, Hamden, CT.

36. On February 6, 2024, at approximately 9:23 P.M. members of the DEA New Haven District Office executed a federal search and seizure warrant at 58 Webb Street, in Hamden, Connecticut. The warrant was authorized by Magistrate Judge Maria E. Garcia on February 6, 2024 (24-mj-114).

37. Once the warrant was executed investigators secured the residence of 58 Webb Street, Hamden. Investigators located within the residence a large sum of U.S. Currency of mixed denominations throughout the residence. In one of the bedrooms investigators located two firearms, additional pistol magazines, ammunition, narcotics, and drug paraphernalia. The narcotics found within the residence matched what investigators were purchasing during the earlier controlled buys – wax folds stamped with (Bugati). While on scene WILLIAMS' girlfriend who was identified as Stasci Flowers provided TFO Fasulo with a sworn written statement that WILLIAMS owned one of the firearms and asked her to hold the gun for him.

## III.   **CONCLUSION**

38.     Based on the information set forth above, as well as my training and experience and that of other law enforcement personnel participating in this investigation, I believe that WILLIAMS and other unknown individuals are using the Subject Vehicle to store and distribute narcotics, and a search of the vehicle is likely to lead to the discovery of evidence of drug trafficking activity, including quantities of narcotics, cash, and other facilities of the drug trafficking trade.

39.     Furthermore, I believe that the two iPhones located including Target Telephone 2 contain evidence of WILLIAMS's drug trafficking activities.  As noted previously, narcotics traffickers often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects of their business, in an effort to thwart law enforcement and insulate themselves and their confederates, to separate customers from suppliers or to deal with different "lines" of customers or purchasers of different types of narcotics.

40.     WILLIAMS's possession of two iPhones is further evidence of his drug trafficking activity.  Even if WILLIAMS kept one "dirty" phone and one "clean" phone, messages showing that Williams was the user of the "clean" phone along with the location information in the "clean" phone showing that it travelled in tandem with the "dirty" phone would be evidence of WILLIAMS's possession and use of the "dirty" phone.

41.     Based on the foregoing, there is probable cause to believe, and I do believe, that fruits, instrumentalities and evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 will be found inside the Subject Vehicle and the Target Telephones as described above, and that warrants to search the Subject Vehicle and Target Telephones should be issued.

38.     Because the Target Telephones and the Subject Vehicle are in the possession of law enforcement, I am requesting authorization to execute these warrants at any time in the day or night.

Respectfully submitted,

TFo

Anthony Fasulo
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me and signed in my presence this 16th day of February 2024.

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A-1

2022 Chevrolet Malibu, bearing California registration 8YLB972, seized on February 6, 2024 from Saint Raphael's Hospital located at 1450 Chapel Street, New Haven and towed to the New Haven Police Department impound lot, located at 710 Sherman Avenue, New Haven, where it is presently located.

<u>ATTACHMENT B-1</u>

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. Secs. 841(a)(1) and 846, namely:

a.      Heroin; fentanyl; crack cocaine; residue of heroin and fentanyl;

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

c.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e.      Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, safe deposit agreements and/or keys;

f.      Items of personal property that pertain to the identity of the person(s) using or controlling the vehicle;

g.      Cellular/digital wireless telephones, and smart cellular telephones and the contents thereof; electronic paging devices, speed dial telephones, electronic speed dialing devices, electronic personal organizers, caller identification memory devices as well as the telephone numbers stored within, telephone answering machines, and telephone answering machine tapes; personal computers, I-Pads, and other computerized devices capable of storing data electronically, and the contents thereof;  external hard drives, thumb drives, memory cards, CDs and DVDs capable of storing data electronically, and the contents thereof; should any such items be seized, investigators will seek further legal process to review the contents stored on these devices.

h.      Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.      Kitchen implements, including but not limited to pots, pans, sieves, grinders, spoons, with or without residue of cocaine.

j.      Firearms and ammunition.

k.      Titles of vehicles, motorcycles, boats, and other property.

2

ATTACHMENT A-2

Target Telephone 2


Smaller iPhone with a cracked front screen with telephone number (203) 361-8137, (Target Telephone 2), seized on February 6, 2024, from Robert WILLIAMS at 309 Poplar Street, New Haven, Connecticut.

1

<u>ATTACHMENT A-3</u>

Other Telephone

Larger green iPhone that is contained within a black phone case with unknown telephone number, seized on February 6, 2024, from Robert WILLIAMS at 309 Poplar Street, New Haven, Connecticut.

1

ATTACHMENT B-2

**Particular Things to be Seized**

1.      With regard to the seized telephones, all information that constitutes fruits, evidence and/or instrumentalities of Robert WILLIAMS's and any co-conspirators' violations of Title 21, United States Code, Sections 846, 841(a)(1), including:

     a.  lists of customers and related identifying information;

     b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

     c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     d.  all bank records, checks, credit card bills, account information, and other financial records. the telephone number, ESN number, serial number, and SIM card number of the seized telephones;

     e.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the seized telephones;

     f.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the Target Offenses;

     g.  any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the seized telephones;

2

h.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the seized telephones, such as passwords, sign-on codes, and program design;

i.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

j.  saved searches, locations, and route history in the memory of the seized telephones;

k.  images and videos in the memory of the seized telephones; and

l.  evidence of user attribution showing who used or owned the seized telephones at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.  It is specifically authorized that stored electronic information, data, information, and images contained in the seized telephones described in Attachment A-2 and A-3 may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

4.  To the extent that the seized telephones contain removable storage media, examination of such removable media is specifically authorized for the same evidence as described in this attachment.